We'll hear argument first this morning in Case 12-315, Air Wisconsin Airlines v. Hoeper. Mr. Cohn. Mr. Chief Justice, and may it please the Court, not even Mr. Hoeper attempts to defend the decision below, and for good reason. Under the plain terms of the statute and consistent with this Court's First Amendment precedents, truth matters, and airlines should not lose their ATSA immunity unless their statements are materially false. None of that is in dispute anymore. Also not in dispute, I think, is that Air Wisconsin was justified in picking up the phone, calling TSA, and conveying certain core facts, namely that Mr. Hoeper was mad at the airline, that he was a Federal Flight Deck Officer, or FFDO, that he had walked out on his training, his last chance to keep his job, and he was about to board a plane. I don't believe any of those facts are in dispute. What is in dispute is how those facts were framed or phrased to TSA on that call, how the report was packaged, and in assessment of that. Scalia. I'm not sure. You said it is conceded that those things should have been brought to the airline's attention. Has that been conceded? I'm not sure. I think they said if they were brought, they should have been brought in a different fashion, but I'm not sure. They have conceded that. I believe they have conceded, Justice Scalia, that those facts could have been conveyed justifiably. If we had conveyed those core facts using different words, there would not be any issue here. Well, you can convey anything justifiably. Sure. I agree with that. And the question, Justice Scalia, is whether we framed or phrased the report in an adequate manner. And in assessing that issue, the question comes down to how much breathing space airlines should be given in making these reports. How much room there should be for permissible characterization and expression in making these reports. And context should be kept in mind in answering that question, three things in particular. First, these reports are being made by airline employees, such as pilots and flight attendants and baggage handlers and ticket agents, who are being told by TSA they have to report in real time, without investigation, without calling their lawyer, without stopping to think on how to refine the perfect script. And they are being told to do this based upon their suspicions, in some cases suspicions of other people's emotions or state of mind. That's one critical piece of context. Can we go back to your response to Justice Scalia? You said that the Respondents conceded, but isn't it the case that it was the Colorado Supreme Court that said that the airline likely would have been immune if they had phrased the report more cautiously? That's exactly right, Your Honor. So it's the Colorado Supreme Court, not the Respondents. Well, I believe the Respondents have also acknowledged that a call could have been made in conveying certain facts. But you're completely correct, Justice Ginsburg, that the Colorado Supreme Court said we'd be likely immune if only we had used different words, and those different words are immaterial. That lower court engaged in hair-splitting discrimination. You're saying there are three critical facts. One is that these reports have to be made on suspicion right away in real time by people like baggage handlers. And your second point was? The second point of context is that these reports are being made to TSA and other reasonable air safety officials for the purpose of passenger safety and aviation security. And TSA tells the airlines, if you have any doubt, report. If you see something, say something. And if you don't say something. And your third? And the third piece of context is the consequences of a failure to make a report can be catastrophic for passenger safety and aviation security. And that's why TSA says if you don't report sincerely held concerns, you might be sanctioned by us for failing to make the report, placing airlines between a rock and a hard place. All right. Kennedy, the issue is in this context, it's not clear to me what the issue is that's before us. My understanding is that there was no finding of falsity. Now, the jury was instructed that it had to be defamatory. Lawyers know that that means it has to be false, I assume. And are you saying that, you know, the jurors weren't instructed as to the definition of defamatory? Is that the point? No. The issue is not about the jury instructions, Justice Kennedy. The question is about the statutory immunity in the Aviation and Transportation Security Act, ATSA, and whether that immunity requires a determination of whether or not the statement was materially false. By the court. By the court, in our view. We think under any standard we should prevail. But what position, although they'll tell us in a minute, does Respondent take on that issue, that a determination by the jury suffices? As you understand their brief, they can talk for themselves in a few minutes. I believe two things. One, I believe they concede the legal question that material falsity is part of the ATSA analysis, and that's the question on which this Court granted cert. The second question, which is not before the Court, is who should decide this issue, the Court or the jury. I believe they feel the jury should answer that question. Again, that issue is not strictly before the Court, but I think on the issue that is before the Court, they agree that material falsity is part of the ATSA analysis. Kennedy, but isn't that implicit in the instruction to the jury that it has to be defamatory? Now, if you say, well, even if it is, the judge, the court has a duty to determine it as a matter of law at the outset, then that's something else. Well, the jury, and this is a question of the jury instructions which are not being challenged or not before the Court, but the jury was not given instruction on materiality. The jury also was not given instruction on clear and convincing. They were not given instruction that the decision should be about what the effect would be on TSA. So the jury didn't answer that question, but the jury shouldn't have answered  But the jury should have answered that question. Scalia, does defamatory require that it be materially false? Can't I defame somebody with a statement in which the derogatory information is not material to anything at all, but it's just derogatory? Under the common law, Justice Scalia, the statement has to be materially false. We agree with that. And we also think that Has to be material false to sustain what? To sustain a defamation judgment. Of course, it depends upon State law, but generally under the common law, the statement has to be materially false. Material to what? I mean, you can have a defamatory statement about a pilot that's not material to, you know, air safety. Is that what materiality goes to, the particular reason that the statement is made? Mr. Chief Justice, that's a very important distinction because in the common law context, you're concerned about the effect on the person's reputation, his general reputation, the community, whereas in the ATSA context, you're talking about a very particular listener. The listener is TSA or a reasonable air safety official. And the purpose of the report So you're saying you can't defame someone gets immunity for a statement that would be defamatory in the common law context, if made generally, but because it's made in the context of information about flight safety, that's somehow immune? Correct, Mr. Chief Justice. The statement might be deemed defamatory if you don't have the ATSA immunity, but because of the ATSA immunity, it's not materially false. So you call some TSA official and say this pilot, you know, is having an affair. That's immune? That would not be immune because that would not be relevant to a suspicious transaction, a suspicious activity or passenger safety.  But it would still support a defamation. Correct. Wouldn't it? It would probably Because it is material to the person's reputation. Correct. And it would not be immune. But the report we had here is not that someone's having an affair, but rather the report we made is that someone might possibly be giving rise to a concern. Well, on the report that was made here, suppose that the report said that the Respondent we believe the Respondent is mentally ill or we believe the Respondent has serious mental problems. Would you make the same argument if that's what was said? With those words, I think I would, Justice Alito, because You would. The same argument, yes. Now, we could, I think there are words that would cross the line. I don't believe those words do, because a couple of things. First, the gist of the statement is still the same. The gist is this is a person who might possibly have a gun and might possibly be in a state of mind. Well, the facts, as I understand it, were that he became very angry during a test, during a flight simulation test. He took off his headset, pushed back his chair through the headset, started cursing at the instructor, and then later he was showing anger and cursing for a period of time in other parts of the facility. Does it go beyond that? Is that fair? That's a fair characterization. And you think based on that, you could say we believe this man is mentally ill? Justice Alito, I'm keeping in mind the first important piece of context, which is these reports are being made by tens of thousands of aviation employees on the ground that could have different educations and socioeconomic backgrounds and might not all speak the way we do, especially in an uncertain context in which the facts are rapidly evolving. Sotomayor I'm sorry. What's so difficult about simply saying he's angry? Why choose the word mentally unstable? Isn't it with an intent to connote something more than the facts? A couple of things, Justice Sotomayor. First, it's not the question is whether the gist of the statement is the same. It's up to TSA to draw the connotations and the implications. Well, yes, but from facts. So isn't there a difference between saying someone's angry and someone's mentally ill, has a mental problem, or is mentally unstable? Don't you think that the intent is to convey something else? Justice Sotomayor, I think that different people express the same thought in different ways. I think a baggage handler in Boston or a flight attendant in LaGuardia might use different words such as he lost it, he went off the deep end, he was acting irrationally, he blew up. In the lower court section you could say he's nuts, but the question is whether somebody would say it. The question is whether that is false. I mean, the mere fact that a lot of people will exaggerate and say things that are simply not true doesn't make it okay. Justice Scalia, a couple of things in response. First, this is not a situation in which there's a simple statement and the person hangs up. There's a conversation with TSA, in this case a 10-minute conversation, in which they probe behind the facts and they found out what happened, that Mr. Hooper was angry and upset and he blew up that morning at training. And second, the lower court recognized this and said if we simply had used irrational and blew up, we'd be immune, as opposed to saying mentally unstable. Scalia, the point is that somebody ought to determine whether the exaggeration or whatever it was, was material, whether it would have made any difference to TSA if it had been described otherwise. And in this case, as I understand it, as the Colorado Supreme Court said, nobody has made that determination, right? The Colorado Supreme Court says it doesn't make any difference whether it would have affected TSA or not, putting it the proper way, right? Correct, Justice Scalia. That's absolutely correct. So that's what we're confronted with, simply the need for somebody to make that factual determination, right? And you're saying what? There's no need to make it at all? Oh, no, no, no, Justice Scalia. We say that there is a need to make that determination. The lower court said no need, material falsity is not part of the ads analysis. Where did it say material? I thought, I thought, I think so far as I've read this, the argument is about the truth or falsity of the statement. And you're saying that the Colorado Supreme Court should have said it has to be false. Isn't that your argument? They had to say it. Okay. Now, I've looked at footnote 17 or footnote 6 or whatever it is on page 17, and I think that their characterization of the Colorado Supreme Court is right. That is, the Colorado Supreme Court is going to be very surprised if we tell them that they never said it has to be false. What they said here is in the determination of immunity, we need not, and therefore do not decide whether the statements were true or false. Correct. Why not? Because, they say, the trial court properly submitted the case to the jury. Accordingly, the jury was entitled to determine the elements of the defamation claim, including whether the statements were false. So as I read that, which I think you'll hear from the other side in about a few minutes, the Colorado Supreme Court says, look, the jury found that the statement was false. So we don't have to worry about that. We're worried about whether the false statement was made with reckless disregard of its truth or falsity or knowledge that it was false. Okay? That's how I read the footnote. And they say something like that on page 30 and 31 of their brief. So if I'm right about that, what are we supposed to do? Are we supposed to say that matters of truth or falsity are not for the jury? Are we supposed to say that the jury went beyond what any reasonable person would go do here? What is it we're supposed to do? Justice Breyer, the lower court recognized that the ATSA immunity question is for the court to decide. And because they left that issue of material falsity to the jury, they said that's not part of the ATSA immunity analysis, and that's error. It shouldn't be. Ginsburg. Did the jury find falsity? Do you recognize that? Did this jury find that the statement was, as you say, materially false? Yes, Justice Ginsburg. The jury did make that determination, but. How did they make it? Because the only thing I see is the special verdict sheet, and it doesn't ask that question. Correct. What the jury did, first of all, first of all, shouldn't have gone to the jury, because it's part of the ATSA immunity analysis, which is for the court to decide. But second, the jury did not ask whether or not our statement would have a different effect on TSA, which is the proper test here. Yes. There are two different issues of falsity that we're talking about here, of materiality. One is the defamation issue. And it is material to say that somebody is mentally unstable when all that he did was lose his temper. Okay? That's my view of it. That does not answer the question of whether calling him mentally unstable instead of he lost his temper, or just saying he lost his temper, would have produced the same effect with the airlines, whether the airlines, even if he had said, well, he lost his temper, he's been fired from his job, he may have a gun, whether that alone, without saying he was mentally unstable, would have induced the airline to take him off the flight. There are two different questions. The materiality for defamation is quite different from the materiality for purposes of obtaining the immunity under this Act. The latter question is for the court, but the former is for the jury, it seems to me. I agree completely, Justice Scalia. That's absolutely correct. And unless this Court has further questions, I would like to respond. I do. I'd like an answer. Well, you don't, you can do it in your rebuttal, but I'd like an answer to my question. My answer, Justice Breyer, to your question is that the jury answered a different question. They answered the question about whether it's material under defamation law, not whether it's material to TSA as required by ATSA, and that determination should not go to the jury. That's for the court to decide. And the lower court said, I'm not going to, we're not going to address that question. We're not going to address it because it's not part of ATSA, and that was a legal error, as even Mr. Hooper concedes. Thank you, counsel. Mr. Feigin. Mr. Chief Justice, and may it please the Court. It's essentially undisputed that in order to encourage airlines to report suspicious activity to the proper authorities, the ATSA immunizes such reports when they're materially true. I want to emphasize two main points about the scope of that immunity. First, ATSA gives airlines very wide latitude in how they describe the suspicious activities. These reports are made against an inherently uncertain factual backdrop, and that's why the statute protects reports of any suspicious transaction relevant to a possible violation of law or regulation relating to air safety. Misconceptions and exaggerations can occur not only because of confusion about the facts, but because of the emotion, the stress, and potentially even the fear that may go along with making one of these reports. Kennedy, do you think that the statute 44941 was intended by the Congress to incorporate the New York Times Sullivan standard, the Masson v. New Yorker standard? And if so, then it seems to me that the airline is under a duty more strict than the one that you have just explained and that Petitioner's counsel has explained. Well, Your Honor, I think there's a distinction between Masson and this case. Masson follows the more general defamation law rule about whether a statement is materially false in terms of a person's reputation, whereas here the focus is on what a reasonable security official would believe. And we think that's fairly seen in the text of the statute, which again protects statements about any suspicious transaction relevant to a possible violation of law or regulation. So what these statements are intended to convey is a suspicion of a possible threat. And the gist in this context, what has to be true in this context, is the suspicion of the possible threat. And I want to emphasize that because the statute talks about suspicions and possibilities, that the actual factual basis for what's reported doesn't need to be particularly strong. So you want us to write an opinion that says that the statute here is to be interpreted differently than if it were a New York Times and Sullivan case or a Masson and New Yorker case? Well, Your Honor, I think the only real difference is the context. I think in Masson you're talking about readers of a general interest magazine, New Yorker magazine, whereas here the audience for these reports is much more specialized. It's law enforcement officers who are receiving reports of suspicious activity. Now, they're not interested in someone's reputation as a general matter. What they're interested in is what kind of threat the person might pose and what might happen to an airplane in the next period of time that they have to worry about. And I think it's particularly important that the Court give wide latitude to statements in this context because there's a substantially similar provision that protects individuals who make reports to law enforcement authorities. That's in 6 U.S.C. 1104. And I think it would be very unfortunate if someone responding to the TSA's ubiquitous see something, say something campaign were to inadvertently or recklessly, as later concluded by a jury, have some sort of exaggeration about what they were reporting and then find themselves liable for civil damages just for trying to do a job there. I accept that for the moment. Accept all that. It's bothering me. A picky little point. But the picky point is that your statement of the question, whether a TSA immunity may be denied without a determination that the air carrier's disclosure was materially false, nope, can't be. But I read the footnote, footnote 6, last sentence. It says there was such a determination. The jury made it. And we don't have to go back over it. So what are you arguing? Are you arguing that there should be like as there is in free speech cases, you know, a special duty upon an appellate court to go back over such a jury finding? Are you saying the Colorado Supreme Court was wrong in the second part of footnote 6 when it says the jury made it? What am I supposed to do, in your opinion? Well, what you're supposed to do in this case, Your Honor, is that the jury find the finding that the jury made, first of all, the jury wasn't actually instructed on materiality. They may have waived it, you know. But assuming for the sake of argument the jury found the statements were materially false, it only did so in the context of the State law defamation verdict. And as Justice Scalia explained and as I tried to explain earlier, there's a difference between materiality from the perspective of someone's reputation and materiality for purposes of the TSA in the inquiry that should be conducted. But my understanding of what the Colorado Supreme Court did is this. On the issue of ATSA immunity, it said very clearly that is for the court. And it says in footnote 5, it may – it gives no weight to the jury's findings of fact with respect to the facts that it found on the immunity question. And then at the end of footnote 6, what it said was, having found that there is no immunity, then it was proper for the trial judge to submit the defamation issue to the jury, and the jury made findings on the defamation issue. Is that – is that your understanding as well? That's my understanding of the Supreme Court of Colorado's opinion, Your Honor. Now, are they right that in determining ATSA immunity, the jury has no role? Does it make findings of historical fact? Who said what? Anything like that? Well, Your Honor, I don't think this is encompassed within the question presented, but our view, as we explain in footnote 6 of our brief, is that under ATSA, questions of historical facts, such as what was actually said on the call and what actually happened, would be submitted to the jury. Materiality is a mixed question of law and fact. We believe that also should be submitted to the jury, but with very careful jury instructions making clear the very wide latitude that airlines have in this context. And because airlines have such wide latitude in this context, we think very often courts will be able to get rid of these kinds of cases at the motion to dismiss or to not submit to the jury. Sotomayor, can you disagree with Justice Scalia? He drew a distinction between two forms of materiality, whether something's materially false, meaning is it misleading. That presumably would go to a jury. But whether or not this misleading statement would be material to the TSA or the security officers is a question for the Court. Do you disagree with that position by him? Again, Your Honor, we don't think the Court needs to address it here, but we actually think a jury would resolve the materiality question under the ATSA. You give the jury two different instructions. You are to find materiality for purposes of whether it's defamatory or not. And then having found that it is defamatory, you must make a second materiality finding, namely, would this defamatory statement have caused TSA, if it had been accurate, would TSA not have taken the action that it did, not have removed this man from the flight? You're going to give the jury those two instructions on materiality? We do think the Court should give the jury separate instructions on ATSA, and then if it passes the ATSA bar, you'd go on to defamation law. But, Your Honor, I'm not going to fight the Court too hard if it wants to say that this is a question for the Court. What I'd really like to emphasize here is that what the SGS opinion on whether this is an issue for the Court or the jury. I mean, you don't have to fight us. What is your view? Your Honor, we are comfortable with the Court saying that it's a question for the Court. Our reading of the statute is that it would be a question for the jury. There would be an instruction, as there was in this case, although not a proper instruction, on all the elements of ATSA, with the Court making the law very clear to the jury that it has to apply for ATSA, and then if the jury gets past that, they would get a separate set of instructions. Roberts, you don't – there's no reason, and presumably a good trial judge wouldn't instruct the jury on those two separate questions using the same word, right? I mean, you could articulate what you mean by material in each context. In other words, you don't have to say it would be material. The TSA would say, just as my colleague has suggested, whether or not TSA would have done anything different if different – a different formulation had been used. That's right, Your Honor. I think you could ask how TSA would have understood the statement with their particular eye towards the suspicion of a possible threat that's being conveyed. And you'd feel snug and comfortable in making reports to airlines knowing that whether you're going to be held liable is going to be up to some jury who is going to see that this person, his career was ruined, and it's going to be up to the jury to say whether he can recover or not. Your Honor, we're comfortable because of the fact that we're going to be held liable for that. That doesn't give me a lot of – a lot of comfort. If you're really concerned about enabling people to come forward without fear when they have a suspicion of something, I'm saying, well, you know, some jury will decide whether you put it wrongly or not. And if you're putting it wrongly, it would have made a difference. It doesn't make me happy. Your Honor, I think what's going to provide the adequate good feelings that airlines will have making these reports, make them feel safe making these reports, is for this Court to emphasize the very wide scope that the ATSA gives to how airlines characterize the statement they make. Well, Mr. Feigin, they have that wide scope because of the actual malice standard, that somebody needs to show that there was actual knowledge of falsity or reckless disregard as to falsity. And you're saying that we should do something different. You're saying that we should expand what falsity means in this context as a sort of extra protection. And I guess, why is that true? Well, Your Honor, I don't think we're doing anything different from the actual malice standard except taking account of the context. In this particular context where there's a lot of factual uncertainty, a lot of emotion mixed in, and the audience aren't readers of, for example, a general interest magazine, they're security officials looking for suspicion of a possible threat, we think that the scope of the materiality test is very broad. Thank you. Thank you, counsel. Mr. Russell. Mr. Chief Justice, and may it please the Court. There are two sets of questions before the Court here. There's a legal question about the proper interpretation of ATSA and maybe some subsidiary questions about the division of authority between judge and jury and what the materiality standard is. And then there's a question about what to do with this case. And those two sets of things should be considered differently because much of what's being argued here today was not presented to the lower courts. So let me start. I'm the trial judge, and I conclude that if Air Wisconsin had said to the TSA, along the lines of Justice Scalia's earlier question, we have an employee who was terminated today, he probably knew it, he lost his temper during a test, he might think that some of our employees are out to get him, and there may even be some truth to that. He's authorized to carry a gun. We don't know if he has one or not. We're giving you this information. Suppose I'm the trial judge. I conclude that if that information had been given to TSA, TSA quite promptly stopped this plane to examine the pilot. Do I send the case to the jury? Let me unpack. I think there's three parts to that question. The first is implicit in it is ATSA immunity factual questions for the Court or for the jury. And we agree with the government that you should apply the ordinary qualified immunity standards and historical disputes about the facts are handled by the jury. Of course, if the Court can say, look, even on the plaintiff's view of the facts, immunity is proper, you can enter summary judgment. The second question is what is the materiality standard? Justice Scalia, you've suggested that the standard is would TSA have done the same thing anyway. And I take the government to even be saying that that's not the right test, because we can't know because TSA won't tell us. TSA has to keep secret its procedures about what it would do and when. And as a consequence, I think the proper standard is the standard that applies under New York Times and in other defamation cases, which is the Masson standard. Would a true statement have a different effect on the security official's mind? And we think you can have a gloss on that that says the Masson reporter for the New York magazine spent months on this article. They had proofreaders. They had editors of New York. And you're saying the same standard applies to the baggage handler who has only 10 minutes to decide whether he's going to talk to the TSA? I'm saying the same standard of material truth applies. Actual malice, the subjective good faith is the principal protection afforded to the baggage handlers. Even if what he says is blatantly, materially false, so long as he believed it, so long as he acted in good faith, he's protected here. And so the question is what happens when somebody like Mr. Doyle, who has been found to have acted in bad faith, and that's not challenged here, does he nonetheless get immunity because what he said was materially true? And we think the standard of truth applies. Ginsburg-Miller Can we go back to the who decides question? I find it very confusing. Now, everybody seems to say, well, it's the jury that decided, that decides, but the Colorado Supreme Court said that it recognized that the court was to decide this question, not the jury. And in this case, the jury decided it. That was error, the Colorado Supreme Court said, but it was harmless. So who decides? Is it the court or the jury? I think that the answer to the legal question is that you have the same division that you have in qualified immunity, that material disputes of fact are resolved by the jury. And then the court reviews those findings under the normal statute. Kennedy So under my question, I first asked you, I'm the trial judge, I made the determination that TSA would have acted the same way. I still have to submit this to the jury? If you think that there's no disputes about those facts, that no reasonable jury could conclude otherwise than those facts, and you think? Kennedy No. I thought that even if the facts had been reported much more accurately than they were, that the TSA still had a duty to investigate. Kennedy All right. So that's Kennedy Could I make that determination as a matter of law? Kennedy I don't. I think the materiality question goes to the jury, subject to review by the court on a motion for a directed verdict, whatever. But there's also this group. I also want to make clear that I disagree with the premise of that question about what the standard of materiality is. And it's not whether TSA would have acted differently. It's whether TSA would have had a different impression about facts that are undoubtedly material to their determination, not only about the extent of the threat, but also what to do in the immediate aftermath. They have to make a decision from the get-go, not only whether to investigate or not, but whether or not to respond by sending an officer down or scrambling a SWAT team. And certainly being told that somebody is mentally unstable and may be armed is going to be materially to a materially different impression on their minds about those questions. Kagan Because I'm not sure about what you just said, because even the way you just phrased that, you're asking what TSA would have done. How else can we think about materiality other than by asking, well, if you were a TSA officer and you heard this, what would you have done? Stewart You apply the Masson test, which is would a truer statement have a different effect on the mind of the reader? It doesn't mean that they have to have done something differently. It's just that they understand the facts differently than they do based on what was said. Roberts So you're saying if it made a difference in their mind whether to send one officer to his house or a SWAT team somewhere else, that's material and you lose immunity? Stewart That's materially false, yes, if the difference would have made a difference in their mind. Roberts If the difference in the language causes TSA to do anything differently, then you lose immunity? Stewart I think you would, but that's not the question. The question is would this statement have a different effect on the reader's or the listener's mind? Roberts A different effect on who? Stewart The listener's mind, the TSA. Roberts The TSA. But that's what I'm saying. Let's say the TSA person looks at it and says, this is, you know, if it had been phrased, as you say, this is silly, I'm not going to do anything. He says, well, it looks silly to me, but I'm going to send it to my supervisor. That's a different effect on the listener's mind. And you say that difference causes the airline to lose immunity. Stewart I think so. And in addition, whatever you say about this, you should also keep in mind what was actually argued below. And let me say a few things about how this went down. Well, before you get to that, before you get to that, to finish up on the point you were making earlier, suppose that the report is he ranted for 10 minutes, and then suppose the jury found he ranted for 7 minutes. Now, maybe those 3 minutes would make a difference, make a difference in the impression on the TSA. That would be enough in your view? Stewart I think it has to make a difference in the way that they would evaluate the existence, nature or extent of the threat. And so if, you know, it wouldn't make a difference to the way that they evaluated the nature or the extent of the threat, then it's not material. But keep in mind, the way that this case was litigated below, they themselves proposed the Masson standard. And it's we've reproduced their brief to the Colorado Supreme Court. It's on page 30A. They say, a statement is not considered false unless it would be page 30A of the red brief. It is where we reproduced their Colorado Supreme Court brief. And on page 30A, they say, a statement is not considered false unless it would have a different effect on the mind of the reader from what the pleaded truth would have produced, and they cite Masson. This newfound ATSA-specific materiality test comes largely from the United States invitation brief at the search stage in this case. And they never asked for an instruction on materiality at all, much less an ATSA-specific materiality instruction to the jury. They never argued for an ATSA-specific materiality test in the lower courts. Kennedy Well, I think you're right. They seem to rely mostly on the proposition that this all should have been submitted to the judge. That's correct. That was their principal argument below, and that's clearly wrong. And the United States agrees with us that that's not the right way to go about dealing with this. This is a statute that is premised on, that is based on the model of qualified immunity, and the Federal courts' qualified immunity factual issues are submitted to the jury and subject to ordinary appellate review, sometimes heightened appellate review with respect to the Federal government. Ginsburg What are the factual issues? I didn't think that there was much dispute about what was said to the traffic safety. So what are the disputed facts that the jury would find relevant to the immunity? So the materiality consider compares what was said, and you're right, there's no dispute about that, and what was true. And there's a lot of dispute about that. But we think that at the end of the day, even if you say that it's a question of law for the Court, even if you take it upon yourselves to decide it, we don't think that there's any way in which they can say that these statements were materially true. Roberts Am I right in understanding that there be two — you would view these two scenarios differently? The same historic facts, somebody calls and said, this happened, this happened,  He was acting crazy, and the next one, this happened, this happened, this happened, and he's crazy. Do you think you lose immunity in the latter case, but not the former case? No, I think you lose in both. You would lose in both? Yes. I mean, I think in both. So a layperson, a layperson who, you know, just looks at this and said, he's acting crazy, they're not immune from that. If they call TSA and say that, everything is true, I guess you would say, up until that characterization. Well, let me be clear about that, then. If they give all the facts, and I'm not sure what all the this is true, this is true, this is true, if they simply explained all the facts and then appended to it their evaluation that it showed that it was crazy, I don't think they would be immune. I don't think they would lose immunity for that. But that's not what happened. They would be — the airline would be immune. The airline would be immune, correct. But that's not what happened in this case. No, no, no. I know. But I'm trying to find out if you think there's a difference between the person's subjective, uneducated evaluation, he was acting crazy, and the difference between that person saying he's crazy. I don't think there's a difference between that. What's the difference is when the person asserts that somebody is mentally unstable as a fact and doesn't give the background facts to allow them to make an alternative. Sotomayor So other than proving at trial that these statements were misleadingly false or false, how did you prove that the statements would have had an effect on a reasonable security officer? I mean, how do you – what's the evidence that you expect parties to present and what was it that you presented to show that their response would have been different? Well, let me ask — answer the second question first, which is we had an expert witness who was formerly in charge of writing security regulations for TSA and the FAA before that who testified that in light of the truth, a call wasn't even warranted, but that he perfectly understood why TSA acted the way it did given the contents of the call. Now, this wasn't a focus because nobody made the argument that this could be materially false. Breyer, we have granted cert on this question, so given that fact, could we do this? One, yes, it has to be false. Two, the Colorado Supreme Court, because of footnotes 5 as well as 6, which I hadn't picked up, and other things they've said, is at least ambiguous about the role the jury's finding played. And given that fact, what we'll do is we'll go through and see where the parties agree about what happened in the world. And insofar as they agree, we'll take it. You see, your side will get the underlying assumption, and looking at it as it's agreed upon, we find either that it would be or wouldn't be within the scope of immunity. And on that one, you might lose. But is there — is there — what do you think of that procedure? Well, I definitely think that it would be appropriate for this Court to write an opinion that says, look, to the extent footnote 6 suggests that some true statements aren't protected by it, so that's wrong. No, it doesn't say that. It says footnote 6 has to be read with footnote 5, which I hadn't picked up. And once I put those two footnotes together, I have no idea what the Colorado Supreme Court says. Well, I think you can say, look, we don't know what it means, but to the extent it means that ATSA doesn't protect all true statements, that's wrong. But in this case, the jury found, and three courts, Colorado courts, affirmed that the statements weren't true. And Justice Ginsburg's — there was an instruction to the jury, it's in Instruction No. 9 on page 579 of the Joint Appendix, that it told the jury that to enter a verdict, they had to find that the statement was false. So the jury found that that was false. On appellate review, two courts of appeals found that there was sufficient evidence for that, even though they didn't ask for a materiality instruction. Those two courts resolved every material falsity claim or every materiality objection that AWAC actually raised in the context in which it actually raised it, which was whether we had satisfied our burden to prove the elements of common-law defamation. Alito, on two of the three statements, the difference between the literal — the very strict truth and what was said is very slight. You dispute that on — they said he's an FFO officer and he may be armed. I think that there's a huge difference. There's no reason to say that he may be armed. That's literally true. It's literally true. He's an FFO officer. He has a gun. He may be armed. Suppose I were to know that there is a lawyer in town who has a concealed carry permit, and I know he has a hearing at the courtroom, at the courthouse down the road later today. If I were to call the security folks there and say, hey, just to let you know, there's a lawyer coming to the argument and he may be armed, everybody would understand that I was saying to them that there is something more than the theoretical possibility that he's armed, and that I have some information to believe that he is violating or intending to violate the law that prohibits him from bringing that gun to the court. What would be a true statement? A true statement would be — Not with respect to the lawyer. With respect to this to your client. I think it would have been true for them to say, look, we're calling to let you know because Mr. Hoekers is an FFDO. We don't have any reason to believe that he has his gun with him, but we can't tell for sure, so we just thought we would tell you in case you have any questions and want to investigate further. By not saying, by not qualifying may be armed with the statement that we have no reason at all to believe that he actually has a gun, which is the truth, I think they gave a very different impression. And Mr. Lauer, for example, the Vice President who made the decision to make the call, testified that if he had been told as a pilot that a mentally unstable person who may have a gun was boarding his plane, it would make him very concerned about the safety of his crew and his passengers. This is at JA 271 to 272. And as a consequence, he said, those aren't the words I would have anticipated being used, because he recognized as somebody in the industry what effect those words would have on a reasonable security person. Mr. O'Rourke. Alito, you're talking about a very subtle implication of the statement. I mean, I agree with you. There's an implication there that may not be justified, but you're talking about something very subtle in the context of someone making a call to report a possible threat. Well, again, I don't think it's that subtle. I think an ordinary person would think I was being misrepresenting in the example that I gave, which I think is the same. But in any event. Just pursuing Justice Alito's point about the other statement, the other is that he was terminated today. Well, he didn't get notice. I mean, that's not an important part of our case. And then the final thing, I guess, was the same thing Justice Alito had in mind, was that he's unstable. Mentally unstable. And that's — you know, this Court has used the phrase mentally unstable as a shorthand for describing people who are subject to involuntary commitment and people who are barred by Federal law from owning a gun. These are trigger words in this context. So the question is the same. But you're not suggesting it would be a different case if they just said he's unstable as opposed to he's mentally unstable, are you? No, because I would understand that they're not saying that he might fall over. Well, that's what you were saying. When Justice Kennedy posed the question that he was unstable, you said mentally unstable. And my point is that that doesn't make any difference to your case, does it? No, it doesn't. It doesn't. I'm sorry. I didn't mean to be facetious about it. But the point is that whether they said unstable or mentally unstable, everybody understood it was the same thing and it had the same implication, which is very serious. They said we were concerned about his mental stability. They said that, but they also said he is unstable. They said unstable pilot. And when you couple those together, even if they just said they were concerned, I think that would be false and misleading, in part because they weren't. I mean, we had testimony. We asked them, did you think that Mr. Hopper was mentally unstable? And Mr. Obrosko said, I don't believe he was mentally unstable. When you think it makes a difference, we're talking here about a pilot. I mean, my impression of pilots is that they are supposed to remain perfectly calm even when terrible things happen. Well, all the engines are on fire and one of the wings has fallen off, but, you know, you don't start ranting and screaming. And so someone described him as acting in a manner that was more unprofessional than they had ever seen. Do you think that makes a difference? I think you could take that into account, but you also have to recognize that hopefully this wouldn't be seen because most people don't get treated as unfairly as Mr. Hopper was. And I think there is abundant evidence for the jury to conclude that he was acting with maybe not the best way, but he was acting within the spectrum of normal human reaction to being treated that unfairly with respect to something that important. But maybe for ordinary people, but how about for pilots? I think even for pilots. So, for example, Mr. Sherman, who is a pilot, he's trained in spotting threats, testified. He's the one who got yelled at. Testified that when he left the training center, he didn't think that Mr. Hopper was acting irrationally. He didn't think that he was a threat. He was shocked to learn that that call to TSA had actually been made. And Mr. Orozco talked to him briefly before he boarded the flight, and he knew at that point that he was an FDO, he was a pilot, he knew about the last chance letter, he knew about the prior incidents of pilots taking down airplanes. And he told him, go ahead, get on the flight. There really isn't. These are the people who would know what is surprising and concerning about the conduct of our client in this case, and none of them were willing to say that he was, in fact, mentally unstable. And that's telling. Even if they are willing to say now through their lawyers that they had concerns about his mental stability, the fact that they weren't willing to say that he was mentally unstable shows that they recognize that there is a material difference between those two statements. Otherwise, they would have said, yes, he was mentally unstable, because we had concerns about his mental stability, and that's the same thing. Breyer, all of us have had the experience, at least I have, of if I get very angry at something, one of my children or somebody, God, he's mentally unstable. You see, I mean, that's – people use that, but in a different context. And what's worrying me is that some real threat comes along, and the lawyers get involved, and the people are going to report it to the TSA, start watching their words, and they don't know what the lawyers mean exactly. And you understand the problem. And so why isn't the best thing to say is, look, there is leeway here. There is considerable leeway on the part of the airline or anyone else who is reporting things to TSA. All it means is they are going to search him more thoroughly. There is enormous leeway already, and that is in the actual malice standard. So long as the person believes that what he's saying is true, so long as he doesn't suspect that it's untrue, he has immunity even if it's grossly untrue. And that's the – that's, I think, one of the reasons why, and you have that protection under the First Amendment to start with, and that's one of the reasons why we are able to identify only six cases, and this is one of them, in the entire 10-year history of the statute, when anybody has even cited this provision in an opinion, published or unpublished, State or Federal. And that's because the protection that's afforded by the actual malice standard, which comes from the First Amendment but also in this statute, provides ample protection for people who are acting in good faith. And I don't think that you need to come up with some special materiality light standard under this statute, particularly when there's no reason to do that. Kagan.              Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. And you say, no. Here we're not supposed to think of the reasonable person generally. We're supposed to think about the reasonable TSA officer. Haven't you conceded that yourself? Well, I think that's an application of the Mass Action Center, which is if you know who the reader is, I think it's reasonable to ask the jury to think about who the reader is. But it's a world of difference to say. Well, how do we know about the reasonable TSA officer? I mean, you made the point that we don't know a lot about TSA officers in terms of what they're going to do with respect to any given set of facts. And, you know, I find it a little bit hard to think about the question what does a reasonable TSA officer think, without thinking about the question what's a reasonable TSA officer going to do. Well, you have the same problem figuring out what he's going to do. In fact, it's much harder. And so I think whatever — if you did up that standard, you'd have the same problem with my standard. And I think my standard is easier to deal with. I think you can look at — you can have expert testimony, as we did. You can look at what — you can ask the people who are in the industry and involved in the case, as we did. And they all seem to recognize that saying somebody is mentally unstable versus saying we have concerns about his mental state or that he is angry would have a hugely different effect on a listener's mind in that industry. That's why Mr. Lauer said he would be very concerned if those words were used and said to him. Sotomayor, I'm sorry. Tell me the difference between having a huge effect on that listener's mind and the listener taking a different action. I'm not sure how — what the difference is. Well, the difference is, I mean, what Mr. Lauer was saying. I'm more upset. I'm more concerned. I'm more concerned, but I'm going to take the identical action. Well, I'm saying that you don't have to figure out what they would have done. In part, this is just general defamation law, right? You are entitled to presume damages so long as what is said affects your belief about this person. And there's nothing in this statute, nothing in the text of the statute, that alters that ordinary standard. Well, but it affects your belief is different in a context like this. It may not affect your belief, but you may decide, but given what's at stake, I don't think he's mentally unstable just because somebody calls and says that. But I'm going to send it up to my supervisor, make sure he feels the same way. And you tell me that you lose immunity if he says, I don't think he's mentally unstable and, you know, throws it away, as opposed to when he says, I don't think he's mentally unstable, but let's see what the boss thinks. Well, certainly what they do with the information is reflective of the effect it has on their mind. So we do think that in any case you could show that TSA would have acted differently, you would necessarily be showing that it had a different effect on their mind. But the problem is, TSA is not going to tell us what they would have done if a different statement had been made. This is not a standard that can actually be applied in the real world. And at the end of the day, it's not necessary because there is substantial protection already provided to good faith speakers who will know that so long as they are believing what they say, they can say whatever comes to their mind without having to consult with their lawyer. In any event, even if this Court thought that that was the standard, even if you thought and were willing to forgive them for not raising that standard in the Colorado courts, we do think that on this evidence there was a basis for concluding that TSA would have acted differently had they known the truth. And that's because, as I said before, we had expert testimony from somebody who was very qualified in this area who said that had he known the truth as a TSA official, he wouldn't have wanted to receive a call. And that he perfectly understood the very dramatic response given the content of what was actually said. Kagan So what are the other things TSA could have done? I mean, let's assume that this call was made and it was a much more in tone, it was much more factual and without using any of these words. But it said the guy really lost his temper and, you know, he has this license and we have no idea whether he in fact is carrying a gun, but he could be. What could the TSA officers have done? What do you think they should have done short of what they did? Say that they were concerned, they thought this might be a problem. What are the mid-level possibilities about of a response? So one possibility is like, it depends very much on when the call was made. Part of the difficulty here was raised that Mr. O'Doyle waited for two and a half hours after receiving this information before making the call. Had the call been made earlier, there was testimony, there's lots of things they could have done. They could have called and checked to see if he had checked in his gun at the security. They could have found him. They could have called him on his cell phone. But even when, having waited as long as they did, they could have asked somebody on the airplane just to go and ask him and talk to him and see if there was reason to believe that there was something amiss that would require going back to the gate. Now, I acknowledge that, again, because the call was so late, there really wasn't a ton that could be done, but that's not a reason to give them greater leeway to say that the call was made. Kennedy No. Kennedy That's what you want us to put in the opinion. Kennedy No. I mean, TSA has told people, report what you know immediately. And so we do think that Mr. O'Doyle's conduct, in which he wasn't consulting with supervisors, he did nothing during that two and a half hours, that would reflect that he had an actual concern about mental stability or danger here. Sotomayor I thought I read somewhere that after this incident there was a discussion between or among Mr. O'Doyle and the various government agencies to figure out how to avoid something like this in the future. Kennedy He did testify to that effect, yes. Sotomayor Who testified? Kennedy Mr. O'Doyle did. Sotomayor And what was your sense? I don't remember the testimony now. What? Kennedy I don't think he gave any details about the content of that discussion, but certainly you can understand why TSA would not want something like this to happen again. Because, you know, when somebody is given false information, particularly when it leads to an elevated response that wouldn't have been necessary under a proper report, that gives rise to security concerns and dangers in itself. When you send armed men onto a plane full of nervous people in close quarters who don't know what's going on, and officers who believe that there may be a man on the gun with a gun who is mentally unstable on the plane, that is a recipe for danger and for accidental things to happen and for people to get hurt, in addition to diverting attention from things that might be actual, more serious incidents that are going on at the same time. Congress didn't think that the way to promote airline security here is simply to give carte blanche immunity to anybody who reports anything about suspicious activity. If they thought that, they could have ended at subsection A. But instead, they recognize that there's a balance and that people who make bad-faith reports that are materially untrue ought not to be immune, recognizing that there might be some deterrent effect at the margins, but acknowledging the need to strike this balance. And in this case, I — whatever you end up doing in this case, and I would like to come back before I leave to this point that this case has been litigated up the chain without any request for access-specific materiality instruction, with the Court addressing every material truth objection that was actually made in the context in which it was made. And it's important to point out that they never, even when they argued material truth, argued that mentally unstable or were concerned about mental instability was materially true. The only argument they ever made about that, and you can read it at the appendix to the red brief, was that this was a protected statement of opinion because it could not be true or false. And there's a world of difference between saying that something isn't true or false and saying that it is true, because to determine whether it's protected opinion, you only have to look at the statement. To determine whether it's substantially true, you have to look at the evidence. And so they have not, at the very least, they have not preserved any argument that the statement mentally unstable was materially true. So at the end of the day, we think that you can satisfy the government's need for clarity about what the legal standard is by simply saying ATSA protects true statements full stop. But nonetheless, affirming this case, the opinion in this case, on the ground that the Colorado court asked whether these statements were true and said that there was sufficient evidence that they were not, and resolved every materiality objection that they actually made in the course of their opinion, the fact that they did it under a different subheading, that they asked the right question under the wrong subheading, isn't a ground for reversal in this case. Ginsburg How do you answer the question? The question in this case was put by the court, the question whether ATSA immunity may be denied without a determination the air carrier's disclosure was materially false. The answer to that question is no, with the caveat that an appellate court has no obligation to resolve materiality objections unless they are actually raised by the defendant. Roberts. Thank you, counsel. Mr. Cohn, you have three minutes remaining. Mr. Chief Justice, and may it please the Court, two very quick points. First, the mixed question, the application of law to facts, most certainly should be decided by the court, not the jury, just like this Court held in Mueller v. Mina, Ornelas, and Cungas. The historical facts are a separate question, but the ultimate question, materiality, is one that should be decided by a court. Sotomayor Well, how do we decide what a reasonable security officer would do? How do we decide it? Sotomayor How does it – how do we as judges? I'm not sure how juries would do it. I'm not quite sure how judges would do it. So what evidence did you proffer? He says he had an expert. What did you have at trial? We had experts, too, and judges should resolve it just like they resolve issues of reasonable force and probable cause. They have to use judgment and common sense in light of the broad leeway that TSA should be given in answering these questions. But the important thing is resolving that issue at the earliest possible stage. Sotomayor Yeah, but we don't decide whether it was reasonable force if we think there's a question about that. If there's a question of historical fact, if there's a question about how a reasonable officer would respond. There's competing experts. Who decides that question? And there are some levels of force that we can say as a matter of law don't qualify as excessive. And we have said that, but when have we said that what might be excessive to one, to some, is a jury question? Is a judge's question. Ornelas said the ultimate question is for a court to decide. But our point is, first of all, the lower court here said the question is for a court to decide for acts of immunity. But under any standard, we should still prevail, because as a matter of law, the statement here simply is immaterial. The falsity, the alleged falsity is immaterial. Under any standard the Court should hold as a matter of law, the standard here is immaterial. And the second point it's going to address is the Court should address that application question in this case, because airlines need guidance, they need clarity, they need predictability on what the law is. And right now there's no predictability, because the lower court held that hair-splitting distinctions make a difference, that the difference between fire today and fire tomorrow is a material difference, and the Court should make clear those hair-splitting distinctions do not make a difference. Kagan. Kagan. What if I think that a TSA might have reacted differently to what was actually said and to what really should have been said? They would have reacted either way. They should have done something either way, but they would have done a different kind of thing. What if I think that? What does that suggest about the proper resolution of this case? I would say it matters on whether that different thing is material. So, for instance, if it's sending one officer versus two officers to the plane, that's not material. That does not make a difference. This is a case this Court should decide. There's no material distinction between mental stability and mental state or irrationality or blow-up. Thank you, Mr. Chief Justice. Thank you, counsel. The case is submitted.